UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JAMES M. ROBINSON,
Petitioner,

v.

NEWPORT NEWS SHIPBUILDING AND

No. 96-2603

DRY DOCK COMPANY; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
Respondents.

On Petition for Review of an Order
of the Benefits Review Board.
(BRB-94-3826)

Submitted: February 24, 1998

Decided: April 20, 1998

Before WILKINS, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Ralph Rabinowitz, RABINOWITZ, RAFAL, SWARTZ,
TALIAFERRO & GILBERT, P.C., Norfolk, Virginia, for Petitioner.
Benjamin M. Mason, MASON & MASON, P.C., Newport News, Virginia, for Respondents.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

James M. Robinson petitions for review of a Benefits Review Board (BRB) order denying workers' compensation benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901-950 (West 1986 & Supp. 1997) (LHWCA). The Administrative Law Judge (ALJ) denied Robinson's request for temporary total disability benefits from September 9, 1991, through February 15, 1992, and permanent partial disability benefits from February 16, 1992, and continuing based upon a loss of wage earning capacity. In addition, Robinson also alleged that Newport News Shipbuilding (NNS) violated section 49 of the LHWCA, for which the ALJ did not grant relief. Robinson appealed to the BRB. Because Robinson's appeal was pending before the BRB for more than one year, on September 12, 1996, the BRB affirmed the ALJ's decision denying Robinson's disability claims. Robinson filed a timely petition for review. On petition for review to this court, Robinson alleges that the ALJ's decision was error because NNS did not prove that it provided appropriate alternative, continuous employment and his termination was related to his compensation claim and violative of the LHWCA. Finding no error, we affirm.

Robinson began working for NNS in 1987 as a welder. He continued to work for NNS until his discharge in September 1991, for violation of Yard Rule 22 regarding repeated absences and tardiness. On June 15, 1990, Robinson hurt his lower back at NNS while picking up a tool box. Robinson's personal physician, Dr. Hunter, diagnosed Robinson's condition as a lumbosacral strain and Robinson returned to his regular work without difficulty. Robinson again injured his back at NNS on July 20, 1990, when he fell nine to twelve feet from a ladder.

With NNS's authorization, Dr. Stiles examined Robinson and diagnosed him as having a bulging disc in his lower back and recom-

2

mended that he not return to work immediately. After performance of a lumbar myelogram and CT scan, Dr. Stiles determined that Robinson was not a surgical candidate and suggested that he be sent to a work hardening program. In March and April 1991, Robinson participated in a work hardening program and the staff discharged him due to his lack of progress. The staff at the program stated that Robinson exaggerated his symptoms, would not attempt some activities and had a decrease in performance from his level prior to admission. Robinson explained that his decrease in performance was due to him becoming more upset in dealing with his disability and that he could not become accustomed to working with pain. The coordinator of the work hardening program, John Meyer, opined that Robinson could not perform all of his past duties as a welder and should be placed in a new job or released for vocational rehabilitation. Meyer recommended physical restrictions for Robinson including no lifting or carrying over thirty pounds or fifteen pounds on a repeated basis; no constant sitting, standing or walking; limited bending, kneeling, squatting, climbing, pushing, pulling, or twisting; and no working overhead or in tight spaces.

Before returning to work, Robinson saw Dr. Allen who recommended light duty, a lifting limitation of no more than forty pounds, and the other restrictions recommended by Meyer. Dr. Allen noted that he questioned Robinson's "underlying sincerity in his attempts to improve." Dr. Hall also agreed with Dr. Allen's comments and restrictions.

When Robinson returned to work, Calvin Langhorne supervised him. At the ALJ hearing, Langhorne testified that Robinson's regular job did not require him to lift more than his job restrictions. After returning to work, Robinson complained that his work restrictions were not strict enough and failed to follow those set out by the work hardening program. Soon thereafter, Robinson saw Dr. Hall, who gave him additional restrictions which included lifting no more than thirty pounds, limited bending, stooping, and climbing, and no working in confined spaces.

After Robinson's restrictions changed, Langhorne made work available to Robinson within what he considered to be Robinson's restrictions. He assigned Robinson to welding with stick metal, a

3

position which did not require lifting more than thirty pounds. In addition, Langhorne recommended to Robinson that because his tool bag would be the heaviest item to lift, that he should remove any unneeded items. Langhorne estimated that the tool bag would then only weigh approximately five pounds, and at most it would weigh fifteen pounds at the beginning of a work shift.

Robinson continued to complain that his back caused him pain and that his job was not within his restrictions. He saw several doctors and was advised to continue to work within the restrictions and that a degree of discomfort should be expected and tolerated. Robinson became increasingly dissatisfied with the diagnoses and treatment by his doctors. He continued to complain that his job was causing him back pain and his job was not within his work restrictions.

Robinson began to miss work and testified that his absences were due to back pain. Between April and September of 1991, Langhorne warned Robinson that if he continued to miss work, his job would be in jeopardy. Langhorne contacted NNS's Supervisor of Personnel, Thomas Coleman, to report that Robinson continued to miss time from work. Langhorne testified that aside from counseling Robinson regarding his absences and eventually reporting him to Coleman, he did not make any disciplinary action decisions. Of the recommendations he did make, Langhorne testified that none of them were based upon the fact that Robinson was attempting to claim disability benefits.

In June 1991, Robinson received a three-day suspension for extensive absenteeism. This was followed by a five-day suspension for extensive absenteeism in the month of June 1991. Between April 18 and June 25, 1991, Robinson missed twenty-four full days and four partial days. In September 1991, Robinson was suspended pending discharge. This suspension period was designed to allow NNS to examine the employee's records and for the employee to present any documentation to support his absences. Robinson did not produce any documentation. NNS discharged Robinson on September 10, 1991, for violating Yard Rule 22 regarding repeated absences and tardiness. Coleman testified before the ALJ that he was aware of Robinson's work-related injury and work restrictions, but that the injury played no role in his decision to discharge Robinson.

4

This court's review of the Board's decisions under the LHWCA is limited to a search for errors of law and deviations from the statutory conclusiveness afforded to those factual findings by the ALJ that are supported by substantial evidence. See 33 U.S.C. § 921(b)(3) (1994); Newport News Shipbuilding & Dry Dock Co. v. Tann, 841 F.2d 540, 543 (4th Cir. 1988). Substantial evidence is described as "more than a scintilla but less than a preponderance," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Elliott v. Administrator, Animal & Plant Health Inspection Serv., 990 F.2d 140, 144 (4th Cir. 1993) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Further, this court must defer to the ALJ's credibility determinations and inferences from the evidence, despite the fact that more reasonable conclusions might be drawn from the evidence. See Tann, 841 F.2d at 543; see also Kellough v. Heckler, 785 F.2d 1147, 1150 n.3 (4th Cir. 1986) (appellate deference accorded to ALJ's findings of fact).

To qualify for disability benefits under the LHWCA, Robinson must establish his inability to return to his regular and usual employment. See Tann, 841 F.2d at 542. NNS does not dispute that Robinson is unable to return to his pre-injury duties as a welder in the shipyard; thus, Robinson meets his burden of showing disability. However, NNS may rebut the presumption of disability by proving suitable alternative employment is available upon a reasonably diligent search by the claimant. Id. NNS satisfies this burden "[b]y proving that the injured employee retains the capacity to earn wages in regular, continuous employment." Lentz v. Cottman Co., 852 F.2d 129, 131 (4th Cir. 1988).

The record contains substantial evidence to show that work within Robinson's restrictions was available in the welding department. Langhorne, Robinson's supervisor, testified that the heaviest lifting required was lifting a fifteen pound tool bag twice a day. Langhorne also testified that he did not assign jobs to Robinson involving tight spaces, climbing ladders, lifting more than thirty pounds, or more than limited bending or stooping. The ALJ specifically found this testimony to be credible. Considering the evidence in the record, we find that NNS provided employment to Robinson within his restrictions.

Robinson also brought a retaliation claim under section 49 of the LHWCA, alleging that he was discharged because he had filed a

5

claim for benefits under the LHWCA and not because of absenteeism. Robinson argues that NNS intentionally caused him to be absent from work by requiring him to perform "contraindicated work." Robinson argues that the NNS clinic imposed restrictions that would pre-determine his fate and would insure failure at his position and the nec-essary absence from his position due to back pain.

Section 49 of the Act provides that "[i]t shall be unlawful for any employer . . . to discharge or in any other manner discriminate against an employee as to his employment because such employee has claimed or attempted to claim compensation . . . under this chapter." To be successful, a section 49 claim must have two elements. "First, an employer must commit a discriminatory act, `the essence of [which] lies in the different treatment of like groups or individuals.'" Holliman v. Newport News Shipbuilding, 852 F.2d 759, 761 (4th Cir. 1988) (internal citation omitted) (quoting Dickens v. Tidewater Steve-doring Corp., 656 F.2d 74, 76 (4th Cir. 1981)). Second, the discrimi-natory act must be motivated, at least in part, by animus against the employee because of the employee's pursuit of his rights under the Act. See Holliman, 852 F.2d at 761; see also Geddes v. Benefits Review Bd., 735 F.2d 1412, 1415 (D.C. Cir. 1984). The issue is whether NNS's actual motive was discriminatory. If Robinson was discharged for a non-discriminatory reason, there is no violation of section 49. See generally Williams v. Newport News Shipbuilding & Dry Dock Co., 14 BRBS 300, 303 (1981).

Coleman's undisputed testimony was that between April 18, 1991, and June 25, 1991, Robinson had twenty-four full days and four par-tial days of unexcused absences. Between that time and Robinson's discharge he missed an additional seven full days and two partial days without excuse. Coleman further testified that NNS followed all five steps of its five-step disciplinary procedure for addressing problems with absenteeism. The ALJ noted that Robinson was disciplined three times for problems related to his attendance prior to his injury.

Robinson contends that every absence since his July 20, 1990, injury was medically related. However, Robinson failed to provide the requisite medical documentation to prove this, as is required of all employees. Further, Robinson did not provide any actual or circum-stantial evidence to demonstrate that NNS's motive for the discharge

6

was discriminatory. We therefore find that Robinson did not prove that a discriminatory act occurred.

We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

<u>AFFIRMED</u>

7